1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

Estate of MYLO HARVEY, and DIANE
HENRY, as the personal representative of
the Estate,

Plaintiffs,

v.

KEITH JONES, BENJAMIN KALICH,
CLYDE TURNER, JOHN DOES ONE
THROUGH TEN, and CITY OF EVERETT,

Defendants.

CASE NO.  C05-1170RSM

MEMORANDUM ORDER
GRANTING IN PART AND
DENYING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

## I.  INTRODUCTION

This matter comes before the Court on defendants' Motion for Summary Judgment. (Dkt. #15).  In this § 1983 civil rights action, defendants argue that Officers Jones, Kalich and Turner used force reasonable under the circumstances during Mr. Harvey's arrest and did not violate Mr. Harvey's rights under the Fourth Amendment, defendants are protected by qualified immunity, and there is no factual basis for imposing civil rights liability on the City of Everett because there is no official policy or custom that served as the moving force behind the officer's actions.  Plaintiff responds that summary judgment is not appropriate on the excessive force claim or on the right to medical care claim, especially in light of civilian accounts of the incident.

MEMORANDUM ORDER
PAGE - 1

Plaintiff further argues that none of the officers are entitled to qualified immunity because there is a question as to whether the officers used excessive force, and finally, there is a genuine issue of material fact as to the liability of the City of Everett.  (Dkt. #24).

For the reasons set forth below, the Court agrees with plaintiffs in part, and hereby GRANTS IN PART and DENIES IN PART defendants' motion for summary judgment.

## II.  DISCUSSION.

### A.  Background

This lawsuit arises from events occurring on November 11, 2002, when Mylo Harvey was involved in a police struggle that eventually resulted in his death.  According to plaintiff,  on the evening of November 11th, several people reported to Everett police that there was a naked man walking on Casino Avenue, and he was acting irrationally.  That man was later identified as Mr. Harvey.  While the facts of the encounter between defendant officers and Mr. Harvey are largely undisputed, to the extent that there is a difference between the parties' versions of events, the Court views the facts most favorably to the non-moving party – in this instant case, plaintiff.

Officer Keith Jones received a call over his radio at approximately 7:19 p.m. about a naked man wandering in the street, and was asked to respond to the scene.  Apparently he was afraid to answer the call by himself, so he asked dispatch to send additional officers to back him up.  He also requested that a responding officer bring a stun gun.  Officer Jones arrived at the scene at approximately 7:23 p.m.

When Officer Jones arrived at the scene, a woman told him that the man was inside the Tesoro gas station.  When that man, Mr. Harvey, stepped outside the station, Officer Jones could see that he was completely naked.  Mr. Harvey was yelling and screaming, but Officer Jones couldn't understand him.  He believed that Mr. Harvey was either under the influence of drugs and alcohol, or that he was mentally ill.

MEMORANDUM ORDER
PAGE - 2

Officer Jones shone his police car spotlight on Mr. Harvey's face. While remaining inside his vehicle, Officer Jones then repeatedly instructed Mr. Harvey over the loud speaker to get on the ground. Mr. Harvey did not react. Instead, he walked towards the police car. Officer Jones believed he was walking towards the car in a combative manner. Officer Jones responded by backing up his police car. Officer Jones then radioed dispatch that there was a naked man chasing his car.

Officer Jones then noticed that Officer Benjamin Kalich had arrived at the scene. Officer Jones got out of his car, but left the doors unlocked and the engine running. Mr. Harvey approached the driver's side of the car. Mr. Harvey opened the driver's side door, stating that he needed a ride. It is not clear whether he actually got inside the car. Civilian witnesses state that Mr. Harvey did not enter the vehicle, and none of them saw Mr. Harvey attempt to open the car door. Officer Jones stated that Mr. Harvey may have gotten one foot in the car. In any event, Officer Jones felt scared so he took out his pepper spray, dropped it on the ground because his hands were shaking, then picked it up and sprayed Mr. Harvey in the face. Mr. Harvey started patting his eyes, and repeatedly stated that he did not want to die.

Officer Jones walked around the back of his car and ordered Mr. Harvey to get on the ground. Mr. Harvey kept repeating that he did not want to die, but ignored the command. Officer Jones then took out his police baton and struck Mr. Harvey on the legs and thigh area, swinging the baton with full force.

Mr. Harvey appeared to have no reaction to the baton, but kept talking to himself. Officer Jones kept hitting him, and eventually he dropped to the ground on his hands and knees, where Officer Jones sprayed him again with his pepper spray. Mr. Harvey began screaming and yelling, and Officer Jones began to kick Mr. Harvey's arms and legs to try and make him lie completely flat on the ground. At some point, Mr. Harvey was able to get free and began walking towards Officer Jones' car again. As Mr. Harvey was walking, Officer Kalich tackled

MEMORANDUM ORDER
PAGE - 3

1   him from behind.

2        Officer Kalich attempted to hold onto a struggling Mr. Harvey, while Officer Jones

3   continued to hit Mr. Harvey with his baton.  Officer Jones states that several of the baton blows

4   glanced off of Mr. Harvey's and Officer Kalich's heads.  Mr. Harvey was able to slip free again,

5   but Officer Kalich grabbed him and threw him into a wooden fence.[1]  Mr. Harvey repeatedly

6   asked Officer Kalich not to let him die.  Mr. Harvey slipped away again, but by that time, Officer

7   Clyde Turner had arrived at the scene.[2]

8        Officer Turner states that when he arrived at the scene, he heard Mr. Harvey saying, who

9   are you, and, I've got to go.  Mr. Harvey had blood on himself and he was very warm to the

10   touch.  Officer Turner was able to pin Mr. Harvey against the fence again, and then all three

11   officers and Mr. Harvey fell to the ground.

12        Mr. Harvey rolled onto his back, and Officer Turner got on top of him and straddled

13   him.  Officer Turner states that he tried to calm Mr. Harvey down and ask him some questions,

14   but Mr. Harvey was not coherent.  Officer Turner then pulled Mr. Harvey's head up and pressed

15   it against his chest.  Mr. Harvey's breathing was hard, raspy and labored.  Mr. Harvey continued

16   to struggle, and Officer Turner continued to keep Mr. Harvey on the ground using various hold

17   techniques.  He also continued to keep Mr. Harvey's head pressed against his chest, and at

---

21   [1]  Officer Kalich states that he pushed Mr. Harvey against the fence, causing him to slide to the ground.

22   [2]  Civilian witnesses describe the scene much more violently.  Witness Emily Amos states that she saw an officer repeatedly hit Mr. Harvey in the head with an object, with as much force as the officer could muster.  She also witnessed the officers kick Mr. Harvey many times.  Ms. Amos also states that Mr. Harvey did not attempt to kick or hit the officers, nor did she hear him verbally threaten the officers.  Witnesses Christy Thompson and Jeremy Thompson also state that they saw officers hitting Mr. Harvey in the head, with a baseball style swing, and with as much force as they could muster.  Ms. Thompson states that after one such blow to Mr. Harvey's head, blood began gushing.

various times, the ground.[3]  The officers state that Mr. Harvey was thrashing around wildly, and hit Officer Turner on the chin at least once.  Eventually, the officers succeeded in handcuffing and hobbling Mr. Harvey's feet.

At some point Officer Turner felt Mr. Harvey go limp.  During the struggle an aid car had arrived.  The officers assert that as soon as they noticed that Mr. Harvey appeared to be unconscious, they brought him over to the aid crew.  The aid crew placed Mr. Harvey on a backboard and began treatment.  Mr. Harvey was still breathing when he was placed on the backboard, but stopped breathing shortly thereafter.  The aid crew immediately began to administer CPR.

At the same time, an Everett Fire truck appeared at the scene, and paramedics joined soon after.  The paramedics gave Mr. Harvey IV therapy, and then orally intubated him.  He was transported to the hospital at 7:50 p.m.  Although Mr. Harvey did begin breathing again, he never regained consciousness.  He was kept alive on life support until November 15, 2002, at which time his family made the decision to withdraw life support, and he passed away.

The Washington State Toxicology Laboratory performed blood screening on Mr. Harvey.  His blood tested positive for cannabinoids and opiates.  He also had a very high level of phenytoin.  National Medical Services performed an analysis of Mr. Harvey's urine, which revealed a high level of psilocin.

Snohomish County Medical Examiner, Dr. Norm Thiersche, performed an autopsy of Mr. Harvey.  He noted several scratches and contusions on Mr. Harvey's head and body, as well as a cut on Mr. Harvey's head that had been repaired at the hospital with staples.  He concluded that Mr. Harvey's death was attributed to hypoxic encephalopathy (lack of oxygen to the brain) following a cardiac arrest while being restrained by the police.  He also noted that agitated

---

[3] Officer Turner states that he was holding Mr. Harvey's head against his chest so that he could monitor his breathing, and that Mr. Harvey was breathing heavily and mumbling during the struggle.

MEMORANDUM ORDER
PAGE - 5

delirium with hallucinogenic substances appeared to be a contributory factor to the cause of death.[4]  He classified the death as an accident.

       This lawsuit followed.  In her complaint, plaintiff raises several claims for relief pursuant to 42 U.S.C. § 1983.  Specifically, plaintiff alleges that the officer defendants violated Mr. Harvey's Fourth Amendment rights by using excessive force during arrest, and that defendant City of Everett violated Mr. Harvey's Fourth Amendment rights by failing to properly train its officers on how to safely deal with persons under the influence or who are mentally ill, how to avoid the dangers of asphyxiation and sudden cardiac arrest that are associated with restraint of agitated individuals, and by failing to equip its officers with safe restraint alternatives.  Plaintiff also alleges that the officer defendants violated Mr. Harvey's Fourteenth Amendment Rights by preventing Mr. Harvey from receiving prompt medical attention, and that defendant City of Everett violated Mr. Harvey's Fourteenth Amendment rights by failing to properly train its police officers on their obligation not to interfere with such medical attention.

## B. Summary Judgment Standard

       Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The Court must draw all reasonable inferences in favor of the non-moving party.  *See F.D.I.C. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds,* 512 U.S. 79 (1994).  The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial.  *See Anderson*, 477 U.S. at 257.  Mere disagreement, or the bald assertion that a genuine issue of material fact exists, no longer precludes the use of

---

    [4] Plaintiff's expert opines that the blows to Mr. Harvey's head with the police baton caused swelling in the brain, which led to the lack of oxygen, and ultimately caused the death.

MEMORANDUM ORDER
PAGE - 6

summary judgment.  *See California Architectural Bldg. Prods., Inc., v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).

Genuine factual issues are those for which the evidence is such that "a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248.  Material facts are those which might affect the outcome of the suit under governing law.  *See id.*  In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *O'Melveny & Meyers*, 969 F.2d at 747).  Furthermore, conclusory or speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment.  *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 60 F. 3d 337, 345 (9th Cir. 1995).  Similarly, hearsay evidence may not be considered in deciding whether material facts are at issue in summary judgment motions.  *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F. 2d 665, 667 (9th Cir. 1980).

### C.  § 1983 Civil Rights Violations

As noted above, plaintiff alleges violations of Mr. Harvey's civil rights under 42 U.S.C. § 1983, based on excessive force during arrest, failure to train and failure to provide prompt medical treatment.  (Dkt. #1 at 5-6).  To prevail on these claims, plaintiffs must prove that defendants acted under color of law and deprived plaintiffs of a constitutionally-protected right.  42 U.S.C. § 1983; *Jensen v. City of Oxnard*, 145 F.3d 1078, 1082 (9th Cir. 1998) (citing *Wood v. Ostrander*, 879 F.2d 583, 587 (9th Cir. 1989).  Accordingly, to successfully defend against summary judgment, plaintiffs must demonstrate that there is a genuine issue of material fact as to whether reasonable force was used during Mr. Harvey's arrest, whether officer-defendants deprived Mr. Harvey of prompt medical attention, and whether the City of Everett had an unconstitutional city policy or custom that was the moving force behind the officers' actions.  The Court addresses each of these issues in turn below.

1    *1. Excessive Force*

2        A Fourth Amendment claim of excessive force is analyzed under the framework outlined

3    by the United States Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989).  In that case,

4    the court instructed that all claims that law enforcement officers have used excessive force in the

5    course of an arrest must be analyzed under the Fourth Amendment and its "reasonableness"

6    standard.[5]  *See Graham*, 490 U.S. at 395; *Smith v. City of Hemet*, 394 F. 3d 689, 700 (9th Cir.

7    2005); *Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1992) (as amended).  That analysis

8    requires balancing the "nature and quality of the intrusion" on a person's liberty with the

9    "countervailing governmental interests at stake" to determine whether the use of force was

10   objectively reasonable under the circumstances.  *Graham*, 490 U.S. at 396.

11       The Supreme Court further instructed that "the 'reasonableness' inquiry in an excessive

12   force case is an objective one: The question is whether the officers' actions are 'objectively

13   reasonable' in light of the facts and circumstances confronting them[.]"  *Id.* at 397 (citations

14   omitted); *see, e.g.*, *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001).  "The

15   question is not simply whether the force was necessary to accomplish a legitimate police

16   objective; it is whether the force used was reasonable in light of *all* the relevant circumstances."

17   *Hammer v. Gross*, 932 F.2d 842, 846 (9th Cir. 1991) (*en banc*) (emphasis in original).

18       In *Graham*, the Supreme Court stated that relevant factors in the Fourth Amendment

19   reasonableness inquiry include "the severity of the crime at issue, whether the suspect poses an

20   immediate threat to the safety of the officers or others, and whether he is actively resisting arrest

21   or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  However, the Court also

22   noted that other factors may also be relevant to a court's inquiry.  "Because the test of

23

24   _____

       [5] The Court notes that the record does not indicate that Mr. Harvey was ever told he was being
25   arrested.  However, because officer defendants had ordered Mr. Harvey to lie face down on the ground,
     and because they were attempting to place Mr. Harvey in handcuffs during the struggle, the Court views
26   plaintiff's claim as excessive force during the course of an arrest.

MEMORANDUM ORDER
PAGE - 8

reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," the reasonableness of a seizure must instead be assessed by carefully considering the objective facts and circumstances that confronted the arresting officers. *Id.*; *Hemet*, 394 F.3d at 701. For example, the Ninth Circuit Court of Appeals has noted that, in some cases, the availability of alternative methods of capturing or subduing a suspect may be a factor to consider. *See Chew v. Gates*, 27 F.3d 1432, 1441 n.5 (9th Cir. 1994).

With this guidance, the Court now turns to defendants' motion for summary judgment in the instant case, also being mindful that if the evidence, reviewed in the light most favorable to Mr. Harvey, could support a finding of excessive force, then the defendants are not entitled to summary judgment. Furthermore, "[b]ecause [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit Court of Appeals] has held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *see also Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (as amended) (explaining that the Court has "held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury."). This is because such cases almost always turn on a jury's credibility determinations.

First, it is necessary to assess the quantum of force used to subdue and arrest Mr. Harvey. As the Ninth Circuit Court of Appeals has explained, the three factors articulated in *Graham,* and other factors bearing on the reasonableness of a particular application of force, are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure. *Chew*, 27 F.3d at 1441. Although defendants continuously couch the defendant officers' actions in terms of how reasonable it was, and how low on the force continuum it remained, by even the officers' accounts, the force used against Mr. Harvey was severe. The officer defendants admit that Officer Jones used his pepper spray on Mr. Harvey

MEMORANDUM ORDER
PAGE - 9

twice, once when he was already on the ground on his hands and knees begging the officers not to let him die. By plaintiff's account, Officer Kalich tackled Mr. Harvey at one point, bringing him down on the pavement, and later threw him into a wooden fence. Throughout this struggle, Officer Jones was repeatedly hitting Mr. Harvey in his arms, thighs and head, causing one head wound that began gushing blood down Mr. Harvey's back. Officer Turner physiically wrestled with Mr. Harvey, using various containment holds, as well as pressing Mr. Harvey's head against his chest and the pavement, which may have obstructed his breathing. Mr. Harvey eventually lost consciousness and later died. The autopsy report shows numerous external injuries, including abrasions and contusions on Mr. Harvey's head, face, chest, abdomen, shoulders, arms, back and buttocks, as well as a head wound that had been repaired at the hospital with staples. The autopsy also showed internal injuries, including cerebral edema, a small amount of cerebral subarachnoid hemorrhage, a contusion on the tongue, a small amount of hemorrhage on the thyroid cartilage and hyoid bone, and an irregular area of hemmorhage over the manubrium sternum. The autopsy indicated that Mr. Harvey had suffered lack of oxygen to the brain, due to cardiac arrest, as a result of the struggle with officer defendants.

To this assessment of force, the Court must apply the *Graham* criteria, starting with the "most important single element of the three specified factors: whether the suspect poses an immediate threat to the safety of the officers or others." *Chew*, 27 F.3d at 1441. In the instant case, there is nothing in the record indicating that Mr. Harvey was armed or that he posed an immediate threat to anyone's safety. Mr. Harvey was a 5 foot 6 inch, 119 pound, nineteen year old, who was naked and yelling, but had not physically threatened anyone outside the convenience store. There is no indication in the record that Officer Jones had been told that Mr. Harvey had committed vandalism inside the convenience store at the time he responded to the police call. Thus, when Officer Jones arrived at the scene, all he knew was that there was a naked man roaming the street and yelling incoherently. By all accounts of the civilian witnesses,

MEMORANDUM ORDER
PAGE - 10

1   Mr. Harvey did not appear threatening, and did not threaten officers.  Indeed, Officer Jones

2   admits that he sought merely to arrest Mr. Harvey for the offense of disorderly conduct, a simple

3   misdemeanor.  Yet, Officer Jones, a 5 foot 11 inch, 210 pound, armed police officer, claims that

4   he felt scared when Mr. Harvey approached his car.[6]  While it is true that Mr. Harvey refused

5   verbal commands to get on the ground, and Officer Jones claims that Mr. Harvey walked

6   towards his car in a combative manner, defendants do not suggest that Mr. Harvey directly

7   threatened the officers or any bystanders during that time.  Moreover, witness accounts differ

8   from Officer Jones' account of Mr. Harvey attempting to enter his car, resulting in Officer Jones

9   using pepper spray in an attempt to subdue Mr. Harvey.   In light of these facts, a rational jury

10  could easily find that Mr. Harvey posed no immediate safety threat to anyone.

11          The second *Graham* factor that the Court considers is the severity of the crime at issue.

12  *Graham*, 490 U.S. at 396.  As noted above, at the time he responded to the scene, Officer Jones

13  was aware only that a naked man was roaming the street and yelling incoherently.  There is

14  nothing in the record indicating that he knew at that time that Mr. Harvey had committed

15  vandalism inside the convenience store.  Indeed, Officer Jones states that he intended to arrest

16  Mr. Harvey for disorderly conduct, a simple misdemeanor.  Thus, the nature of the crime at

17  issue provides little, if any, basis for the officers' use of physical force.

18          The third *Graham* factor is whether the individual actively resisted arrest or attempted to

19  evade arrest by flight.  *Id.*  On this record, there is little indication that Mr. Harvey attempted to

20  flee the scene.  Although he struggled to get away from the officers who were alternately hitting

21  him with batons or fists, and attempting to bring Mr. Harvey to the ground and handcuff him,

22  the record indicates that he was confused about who those officers were.  Officer Turner heard

23  him mumble something to the effect of "who are you?".  Civilian witnesses state that Mr. Harvey

24  _____

25          [6] The Court notes that "a simple statement by an officer that he fears for his safety is not enough;
there must be objective factors to justify such a concern."  *Deorle v. Rutherford*, 272 F.3d 1272, 1281

26  (9th Cir. 2001).

MEMORANDUM ORDER
PAGE - 11

1   never attempted to run away, and that he appeared to struggle because he did not want the

2   officers touching him.  Moreover, earlier in the altercation, Mr. Harvey stated that he needed a

3   ride, as he walked toward Officer Jones' police car.  At that point, Officer Jones had the

4   opportunity to invite Mr. Harvey into the back seat of the car, where Mr. Harvey would have

5   been locked inside with no way to get back out, thereby containing him without further force.

6   In light of these facts, a rational jury could very well find that Mr. Harvey was not attempting to

7   flee from the scene.

8        Beyond these three *Graham* factors, the Court may also consider the availability of

9   alternative methods of capturing or subduing a suspect.  *Hemet*, 394 F.3d at 703; *Chew*, 27 F.3d

10  at 1441 n.5.  Plaintiff argues that there were other techniques available to the officers that

11  presented a lesser threat of serious injury.  For example, Officer Jones could have offered Mr.

12  Harvey "a ride" when he approached the officer's police car by inviting him into the back seat,

13  thereby peacefully containing him.  Similarly, the Court may also consider the absence of any

14  warning when considering whether the force used was objectively reasonable.  *Deorle*, 272 F.3d

15  at 1283.  In the instant case, Officer Jones did not warn Mr. Harvey before he used his pepper

16  spray or before he struck him with his baton.

17       Accordingly, having considered the extent of force used, the three basic *Graham* factors,

18  the availability of other means of accomplishing the arrest and the absence of any warning, the

19  Court finds that the question of whether the force used in this case was reasonable raises

20  numerous issues of material fact that must be resolved by a jury.  Therefore, summary judgment

21  on this issue is not appropriate.

22                          *2.  Prompt Medical Attention*

23       The Court now turns to plaintiff's claim that officer defendants violated Mr. Harvey's

24  Fourteenth Amendment rights by interfering with his right to prompt medical care.  The Court

25  agrees with defendants that, for purposes of summary judgment, Mr. Harvey should be

26

MEMORANDUM ORDER
PAGE - 12

considered to be a "pretrial detainee."  A pretrial detainee is protected by the Due Process

Clause of the Fourteenth Amendment, rather than by the prohibition on cruel and unusual

punishment in the Eighth Amendment applicable to post-trial detainees.  *City of Revere v.*

*Massachusetts General Hospital*, 463 U.S. 239, 244 (1983); *Bell v. Wolfish*, 441 U.S. 520, 535

n. 16 (1979); *Lolli v. County of Orange*, 351 F.3d 410, 418-19 (9th Cir. 2003).  However, the

"eighth amendment guarantees provide a minimum standard of care for determining [a

prisoner's] rights as a pretrial detainee, including [that prisoner's] rights . . . to medical care."

*Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986).

　　　　In order to defeat summary judgment, under traditional Eighth Amendment standards

used in Fourteenth Amendment claims such as this one, plaintiff must show that he was

"confined under conditions posing a risk of 'objectively, sufficiently serious' harm" and "that the

officials had a 'sufficiently culpable state of mind' in denying the proper medical care."  *Lolli*,

351 F.3d at 419 (citing to *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002)).  A defendant

is liable for denying needed medical care only if he "'knows of and disregards an excessive risk

to inmate health and safety.'"  *Id.* (citation omitted).   "'In order to know of the risk, it is not

enough that the person merely 'be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, [] he must also draw that inference.' . . . But if a person is

aware of a substantial risk of serious harm, a person may be liable for neglecting a prisoner's

serious medical needs on the basis of either his action or his inaction.'"  *Id.* (citation omitted)

(alteration in original).

　　　　In the instant case, the Court finds that plaintiff has failed to establish that officer

defendants showed deliberate indifference to the provision of medical aid to Mr. Harvey.

Officer defendants state that as soon as they noticed Mr. Harvey go limp, they immediately

brought him to the aid crew that had been standing by while the struggle occurred.  No more

than two minutes passed between the time the officers noticed that Mr. Harvey was unconscious

MEMORANDUM ORDER
PAGE - 13

and the time that he was strapped to the backboard.  Mr. Harvey was still breathing when he was placed on the backboard, but stopped breathing shortly thereafter.  The aid crew immediately began to administer CPR.  At the same time, an Everett Fire truck appeared at the scene, and paramedics joined soon after.  The paramedics gave Mr. Harvey IV therapy, and then orally intubated him.

There is no evidence that officer defendants unduly delayed in delivering Mr. Harvey to the waiting aid crew after they noticed he was unconscious.  To begin, the 911 call transcript clearly indicates that officers called for an aid car with four point restraint, and also asked that dispatch advise the fire department.  Matthew Park, one of the aid crew members dispatched to the scene, states in his witness statement that he saw an officer on top of what appeared to be a naked man, and that it appeared the man was being restrained effectively because he did not see his legs move.  Mr. Park's deposition does not conflict with that statement.  Indeed, Mr. Park reiterates that he could only see Mr. Harvey's legs, and that he doesn't recall seeing his legs move, but he wasn't looking at Mr. Harvey the whole time.  Thus, the record does not indicate that Mr. Harvey became unconscious prior to the time that Officer Turner states he noticed it, and the Court finds that plaintiff has not raised a genuine issue of material fact as to that question.

Mr. Park also recalls in his deposition that he heard someone ask if Mr. Harvey was breathing, and he heard someone "down there" answer that he was breathing.  Mr. Park also states in his witness statement that an officer was attempting to take off Mr. Harvey's leg restraint when they delivered him to the aid crew.

In addition, Mr. Park did not state that the handcuffs on Mr. Harvey made it impossible for him to administer CPR, or that the officers were "reluctant" to remove them, as plaintiff asserts.  Rather, Mr. Park states that the IV medic advised him to start CPR and to ask an officer to remove the handcuffs.  Mr. Park notes that the officer appeared "surprised" that he

MEMORANDUM ORDER
PAGE - 14

1    wanted the cuffs removed, but did so when he assured her that he needed it done quickly.  He

2    does not indication any hesitation on the officer's part.

3          Similarly, Paul Gagnon, the other member of the aid crew dispatched to the scene, does

4    not state that police officers interfered with his rendering of medical assistance.  In fact, he states

5    that he himself helped restrain Mr. Harvey's legs on the backboard, and makes no indication that

6    this in any way impeded his medical assistance.

7          Finally, there is nothing in the statements or depositions of the paramedics who

8    responded to the scene that indicates any interference with their rendering of prompt medical

9    attention.

10          Accordingly, even viewing the facts in the light most favorable toward plaintiffs, as is

11    required on this motion for summary judgment, the Court finds that there is no question of

12    material fact as to whether officer defendants acted with deliberate indifference to the provision

13    of medical aid to Mr. Harvey.  Therefore, the Court concludes that summary judgment in favor

14    of defendants is appropriate on this issue.

15    **D.  Qualified Immunity from § 1983 Claims**

16          Having determined that plaintiff's § 1983 claim based on excessive force during arrest

17    will not be dismissed on summary judgment, the Court now turns to officer defendants' qualified

18    immunity argument.  Defendants argue that, even if the Court finds that officer defendants

19    violated Mr. Harvey's constitutional rights under the Fourth or Fourteenth Amendments, they

20    are protected by qualified immunity because they reasonably believed that their actions were

21    lawful in light of the clearly established law and information they possessed at the time.  As

22    further explained below, the Court disagrees.

23          Qualified immunity shields government officials, acting within one of their discretionary

24    functions, from civil liability as long as their conduct "does not violate clearly established

25    constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*,

26

MEMORANDUM ORDER
PAGE - 15

1    457 U.S. 800, 818 (1982).  Once a government official raises the issue of qualified immunity,

2    "the plaintiff bears the burden of proving that the right allegedly violated was 'clearly

3    established' at the time of the occurrence at issue." *Davis v. Scherer*, 468 U.S. 183, *reh'g*

4    *denied*, 468 U.S. 1226 (1984).  To be considered "clearly established" for the purposes of

5    qualified immunity analysis, "the contours of the right must be sufficiently clear that a reasonable

6    official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483

7    U.S. 635, 640 (1987).  The Supreme Court has directed that the inquiry into whether or not a

8    claimed right was "clearly established" must focus upon the right not in a general, abstract sense,

9    but rather in a practical, "particularized" sense.  *See, id.* at 640.  Likewise, the Ninth Circuit

10   Court of Appeals has noted that "broad rights must be particularized before they are subjected

11   to the clearly established test," and the constitutional right referenced in *Harlow*, *supra*, "is not a

12   general constitutional guarantee . . . but its application in a particular context." *Kelley v. Borg*,

13   60 F.3d 664, 667 (9th Cir. 1995).

14        The determination of qualified immunity also necessitates an inquiry into whether a

15   reasonable officer could have believed his particular conduct at issue was lawful under the

16   circumstances.  *Romero v. Kitsap County,* 931 F.2d 624, 627 (9th Cir. 1991).

17        In the instant case, the Court has declined to dismiss plaintiff's § 1983 claim alleging a

18   violation of Mr. Harvey's Fourth Amendment rights due to excessive force during arrest.

19   Neither party disputes that at the time of Mr. Harvey's arrest, he had a clearly established right

20   to be free from the use of unreasonable force during that arrest.  However, as discussed above,

21   there are unresolved factual issues surrounding the reasonableness of Officer Jones' use of

22   pepper spray, and the subsequent actions taken by officer defendants in attempting to restrain

23   Mr. Harvey.  Those factual questions are left to the jury to determine.

24        Courts have struggled with the qualified immunity analysis on summary judgment when

25   there are issues of fact relevant to that analysis.  *See Sloman v. Tadlock*, 21 F.3d 1462, 1467-69

26

MEMORANDUM ORDER
PAGE - 16

1   (9th Cir. 1994).  While the question of clearly established law is for the Court, it is the jury that

2   is "best suited to determine the reasonableness of an officer's conduct in light of the factual

3   context in which it takes place." *Id.* at 1468.  The Court recognizes that the existence of a

4   factual dispute is, of itself, not a sufficient basis to deny summary judgment on a qualified

5   immunity claim. *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  However, once the Court has

6   concluded that plaintiff's facts would establish a constitutional violation if proven true, and that

7   the right violated is clearly established, the objective reasonableness of the officer's conduct

8   must be determined in light of the facts of the case.  Those facts are yet to be determined by a

9   jury, and the final step of the qualified immunity analysis must await that determination.

10  Accordingly, as to plaintiff's § 1983 claim based on the alleged use of excessive force during

11  arrest, the motion for summary judgment on qualified immunity must be denied at this time.

12       **C.  Municipal Liability**

13       The Court next turns to plaintiff's municipal liability claim.  To establish municipal

14  liability for failing to act to preserve constitutional rights, city policy must cause a constitutional

15  violation. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

16  "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that

17  the municipality may be held liable under § 1983." *Springfield v. Kibbe*, 480 U.S. 257, 267

18  (1987) (O'Connor, J., dissenting) (quoting *Monell*, 436 U.S. at 694).  The *Monell* Court

19  emphasized that:

20         a municipality cannot be held liable solely because it employs a tortfeasor --
           or, in other words, a municipality cannot be held liable under § 1983 on a

21         *respondeat superior* theory. . . .
           . . .

22         Therefore, . . . a local government may not be sued under § 1983 for an injury
           inflicted solely by its employees or agents.  Instead, it is when execution of a

23         government's policy or custom, whether made by its lawmakers or by those
           whose edicts or acts may fairly be said to represent official policy, inflicts the

24         injury that the government as an entity is responsible under § 1983.

25  *Monell*, 436 U.S. at 691 and 694 (emphasis in original); *see also Collins v. City of Harker*

26

MEMORANDUM ORDER
PAGE - 17

*Heights*, 503 U.S. 115, 121 (U.S. 1992).  Therefore, the Court must first inquire whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.  *City of Canton v. Harris*, 489 U.S. 378, 385-86 (1989).

Similarly, the Ninth Circuit Court of Appeals has explained that a policy is "'a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (*per curiam*) (citing *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).  A policy can be one of action or inaction. *See City of Canton*, 489 U.S. at 388.  Under *Canton*, a plaintiff can allege that through its omissions the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation.  *Id.* at 387-89.  To impose liability against a municipality for its failure to act, a plaintiff must show: (1) that a city (or other municipality) employee violated the plaintiff's constitutional rights; (2) that the city has customs or policies that amount to deliberate indifference; and (3) that these customs or policies were the moving force behind the employee's violation of constitutional rights. *Gibson v. County of Washoe*, 290 F.3d 1175, 1193-94 (9th Cir. 2002), *cert. denied*, 537 U.S. 1106 (2003).

In the instant case, plaintiff alleges that defendant City of Everett violated Mr. Harvey's Fourth Amendment rights by failing to properly train its officers on how to safely deal with persons under the influence or who are mentally ill, how to avoid the dangers of asphyxiation and sudden cardiac arrest that are associated with restraint of agitated individuals, and by failing to equip its officers with safe restraint alternatives.  A municipality's failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to

MEMORANDUM ORDER
PAGE - 18

train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact. *See Canton*, 489 U.S. at 388. The issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy. *Id.* at 390.

In *Board of County Commissioners v. Brown*, 520 U.S. 397 (1997), the Supreme Court discussed the circumstances under which inadequate training can be the basis for municipal liability. The first is a deficient training program, "intended to apply over time to multiple employees." *Id.* at 407 (citation omitted). The continued adherence by policymakers "to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability." *Id.* (citation omitted). Further, "the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." *Id.* at 407-08 (citation omitted).

A plaintiff also might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id.* at 409. The *Brown* Court explained:

> The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policy-makers' choice – namely, a violation of a specific constitutional or statutory right.

*Id.*

In the instant case, both Officer Jones and Officer Kalich state that they never received any training on how to interact with mentally disturbed persons or persons under the influence of

MEMORANDUM ORDER
PAGE - 19

1   drugs.  At the same time, Officer Jones notes that he had been coming in contact with a lot of

2   mentally ill people "on the streets."  In addition, plaintiff submits evidence that the City of

3   Everett failed to so train police officers even after a similar incident had occurred in 1996, in

4   which a man by the name of Douglas Reagan was arrested while naked and agitated, struggled

5   with police officers, and ultimately died.

6           The Court finds that this evidence creates a genuine issue of material fact as to whether

7   the City of Everett's failure to train its police officers on how to deal with mentally disturbed

8   persons or persons under the influence of drugs amounted to a deliberate indifference to Mr.

9   Harvey's constitutional rights.  Accordingly, the Court agrees with plaintiff that summary

10  judgment on this issue is not appropriate.

11          As a final matter, the Court addresses plaintiff's claim that defendant City of Everett

12  violated Mr. Harvey's Fourteenth Amendment rights by failing to properly train its police

13  officers on their obligation not to interfere with medical care.  Because the Court has already

14  determined that officer defendants did not improperly interfere with Mr. Harvey's medical care,

15  and therefore, summary judgment in favor of defendants is appropriate on that issue, the Court

16  also finds that there is no basis for a § 1983 claim against defendant City of Everett.

17  Accordingly, the Court finds that summary judgment in favor of defendants is also appropriate in

18  favor of defendants on this issue.

19                              **III. CONCLUSION**

20          Having reviewed defendants' motion for summary judgment (Dkt. #15), plaintiff's

21  opposition (Dkt. #24), defendants' reply (Dkts. #32), the declarations and evidence in support of

22  those briefs, and the remainder of the record, the Court hereby ORDERS:

23          (1) Defendants' motion for summary judgment (Dkt. #15) is GRANTED IN PART and

24  DENIED IN PART as follows:

25          a.  For the reasons set forth above, the Court DENIES defendants' motion for summary

26

MEMORANDUM ORDER
PAGE - 20

judgment on the issue of whether officer defendants violated Mr. Harvey's Fourth Amendment rights by using excessive force during his arrest.

b. For the reasons set forth above, the Court GRANTS defendants' motion for summary judgment on the issue of whether officer defendants violated Mr. Harvey's Fourteenth Amendment Rights by interfering with his prompt medical care, and DISMISSES that portion of plaintiff's § 1983 claims made on that basis.

c. For the reasons set forth above, the Court DENIES defendants' motions for summary judgment on the issue of whether defendant City of Everett is liable for failure to train its officers.

d. For the reasons set forth above, the Court GRANTS defendants' motions for summary judgment on the issue of whether defendant City of Everett is liable for its officers' alleged interference with Mr. Harvey's prompt medical care, and DISMISSES that portion of plaintiff's § 1983 claims made on that basis.

(2) The Court will address plaintiff's pending Cross-Motion for Summary Judgment (Dkt. #25) in a separate Order.

(3) The Clerk shall forward a copy of this Memorandum Order to all counsel of record.

DATED this 6th day of April, 2006.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

MEMORANDUM ORDER
PAGE - 21